IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE

_____

| | |
|---|---|
| **IN THE MATTERS OF** | ) |
| | ) |
| **L.L., a minor student,** | ) |
| **by and through his parents,** | ) |
| **B.L., and R.L.,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **Br.R. & Be.R.,** | ) |
| **Minor Students,** | ) |
| **By and Through Their Parents,** | ) |
| **Chr. R. and Cha. R.,** | ) |
| | ) |
| **and all persons similarly situated** | ) |
| | ) |
| | ) |
| **Plaintiffs.** | ) |
| | ) |
| vs. | ) No. _____ |
| | ) **CLASS ACTION COMPLAINT** |
| | ) |
| **TENNESSEE DEPARTMENT** | ) |
| **OF EDUCATION; TENNESSEE** | ) |
| **STATE BOARD OF EDUCATION** | ) |
| | ) |
| **Defendant** | ) |

_____

## CLASS ACTION COMPLAINT
_____

COME NOW, THE PLAINTIFFS, L.L., by and through his parents, B.L. and R.L., along with Br.R. & Be.R, by and through their parents, Chr. R. and Cha. R. and file this Class Action Complaint. They respectfully show:

# I. PRELIMINARY STATEMENT

1. This mainstreaming (inclusion) case is brought by three named students, L.L., Br.R, and Be.R., on behalf of a class of between 40 to 70 students per school year who attended a now-shuttered school known as the "Carroll County Special Learning Center" (CCSCL).

2. The CCSCL is a building attached to the Carroll County Board of Education that was filled entirely by students with disabilities. These students received *no* opportunities for mainstreaming or inclusion at all. Instead, they were unfairly isolated and segregated from the general population of non-disabled peers because it was more convenient administratively, or fiscally, to do so. Thus, these students were deprived of the stimulation of the general education environment including the immersive opportunities to learn from, observe, and associate with their non-disabled peers.

3. The Plaintiffs, and the class they seek to represent, are: (i) preschool students who were placed at CCSCL without *any* non-disabled peer access; and (ii) kindergarten through high school students who needed a classroom assistant to participate with non-disabled peers but were instead placed at CCSCL for administrative or fiscal convenience.

4. The Tennessee Department of Education and State Board of Education have long known of the CCSCL. They approved it, but failed to adequately supervise and monitor it, or train the local personnel. As a result, it became a seriously compromised and isolating environment. Ultimately, in May of 2018, after a due process action by L.L., the doors of CCSCL were finally closed. However, there has been no remediation of the past harms to the Plaintiffs and the class.

## II. PARTIES

5. L.L. is a minor child who attends West Carroll Primary School within West Carroll Special School District in McLemoresville, Tennessee.

6. L.L. resides at 6075 Terry Road, Cedar Grove, Tennessee 38321, and is currently a second-grade student within West Carroll Special School District.

7. L.L. has at all times relevant hereto been eligible under IDEA as a child with a disability under the category of development delay. Additionally, L.L. has Hirschsprung disease, which is a disease of the large intestine affecting the child's ability to have bowel movements. Accordingly, L.L. is also covered under Title II of the ADA and Section 504 due to his substantial limitations in speaking, learning, digestion, elimination of waste, and motor skills.

8. Br.R and Be.R are minor children who attend Central Elementary within Hollow Rock-Bruceton Special School District in Bruceton, Tennessee.

9. Br.R. and Be.R. are brothers who reside at 120 Main Street, Hollow Rock, Tennessee 38342. Br.R. is currently a second-grade student within Hollow Rock-Bruceton Special School District and Be.R. is currently a Kindergarten student within Hollow Rock-Bruceton Special School District.

10. Br.R. and Be.R. have at all times relevant hereto been eligible under IDEA as a child with a disability under the category of autism. Accordingly, Br.R. and Be.R. are also covered under Title II of the ADA and Section 504 due to their substantial limitations in speaking, learning, concentration, and their emotional, behavioral, and motor skill limitations.

11. Initials are used in this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA and the Family Educational Rights and Privacy Act of 1974 (FERPA).

12. The Tennessee Department of Education (TDOE) is the "State Education Agency" (SEA), an arm of the state of Tennessee, which is legally responsible for ensuring that a free appropriate education (FAPE) is provided to all students in the state of Tennessee. An "SEA" includes a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, township, school district, or other political subdivision of a State [.]" 20 U.S.C. §1412(a)(1).

13. The Tennessee State Board of Education (TSBOE) is responsible for implementing policies relating to students with disabilities, including that students with disabilities receive a free appropriate public education (FAPE) in their least restrictive environment (LRE). *See* Tenn. Rules of State Board of Education, Chapter 0520-01-09, *et. seq.*

14. TDOE and TSBOE directly or indirectly accept federal funding or assistance within the meaning of Section 504.

15. The state of Tennessee has chosen to receive funding under the IDEA and has established procedures for providing special education services to children with disabilities.

16. TDOE and TSBOE are bound by the IDEA, by Section 504, and by Title II of the Americans with Disabilities Act (ADA).

### III. JURISDICTION AND VENUE

17. This Court has jurisdiction under 28 U.S.C. §1331, in that claims are asserted under the laws of the United States; under 28 U.S.C. §13432(a), in that claims are asserted under laws providing for the protection of civil rights; and under 20 U.S.C. §1415, 42 U.S.C. §12101 et seq., and 29 U.S.C. §794, et seq.

18. Venue is proper under 28 U.S.C. §1391 because TDOE is the State Education Agency (SEA) which is located in Nashville, Tennessee. Nashville is where TDOE exercises its supervisory authority, including the approval of educational placements for students with disabilities by Local Education Agencies (LEAs) to contracted third party facilities as well as approval of the contract between the third party and the LEAs for such placements; and Plaintiffs are subject to such supervisory decisions emanating from Nashville.

### IV. EXHAUSTION

19. L.L. did file a state due process complaint against the local school district. He resolved his claims against the school district (LEA) and has submitted a Consent Decree for a "judicial imprimatur." That settlement expressly carves out claims against the state Defendants. Accordingly, L.L. has exhausted administrative remedies against the LEA and no more is required of him with respect to the State Educational Authority (SEA) which itself appoints the hearing officers in due process hearings.

20. Any further exhaustion for L.L., or exhaustion for Br.R. and Be.R., is not required or would be futile. As explained herein, the claims involve systemic failings relating to the CCSLC. The wrongs being alleged are wrongs for which state hearing officers lack authority to correct, wrongs for which state hearing officers cannot award damages, and

wrongs under 504 and ADA for unequal treatment. Moreover, Hearing officers are simply not equipped to handle class-wide litigation.

21. Additionally, to require multiple potential class members to each exhaust administrative remedies could result in inconsistent rulings and require federal oversight anyway.

22. Finally, cases resting upon cost-based decision-making are appropriate for judicial intervention:

> [This] is precisely the sort of situation where judicial intervention is necessary to fulfill congressional intent and serve the public interest. Left to its own devices, a school system is likely to choose the educational option that will help it balance its budget, even if the end result of the system's indifference to a child's individual potential is a greater expense to society as a whole.

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 864-865 (6th Cir. Tenn. 2004).

## V. FACTS

### A. THE CARROLL COUNTY SPECIAL LEARNING CENTER (CCSCL) WAS A COMPLETELY SEGREGATED FACILITY OFFERING NO MAINSTREAMING OR INCLUSION OPPORTUNITIES AT ALL

23. For school years 2016-2017 and 2017-2018, the West Carroll Special School District and Hollow Rock-Bruceton Special School District, both being special school districts within Carroll County, entered a written contract for special education services. Under the contract, special education services were to be provided through a private service provider, the Carroll County Board of Education.

24. TDOE knew about and approved these contracts for special education services. Specifically, TDOE's Executive Director, Office of Special Populations, reviewed them and approved them.

25. Pursuant to these contracts, the Carroll County Board of Education created an entirely separate school known as the "Carroll County Special Learning Center (CCSCL)." It is attached to the Carroll County Board of Education administrative building.

26. "Mainstreaming," or "inclusion," meaning being educated alongside one's non-disabled peers to the maximum extent appropriate, is not a realistic possibility or aim at CCSL because, by design, there are *no* non-disabled peers at CCSLC. This is true for all subjects, even related arts or extracurricular activities.

27. The CCSL consists of two preschool classrooms, one kindergarten through fifth-grade classroom, and one sixth through twelfth-grade classroom. Upon information and belief, the CCSL consists of between 40 to 70 students total.

### B. PRE-SCHOOL OFFERS *NO INCLUSION*

28. For school year 2016-2017, Be.R was placed in the preschool classroom at CCSL for the preschool grade known as "P3" (preschool for three-year-old children). For school year 2017-2018, Be.R was placed in the preschool classroom at CCSL for the preschool grade known as "P4" (preschool for four-year-old children).

29. Upon information and belief, neither West Carroll Special School District nor Hollow Rock-Bruceton Special School District offers pre-school classrooms for non-disabled children in a general education classroom. As a result, none of the preschool children at the CCSL had any opportunity for mainstreaming or inclusion.

30. For local school districts who do not offer, or offer only a limited range of, public preschool programs, the LRE requirements must be met through different methods such as: (1) providing opportunities in preschool programs operated by other public agencies such as Head Start or community-based care; enrolling preschool children in private

7

preschool programs; locating classes for them in regular public elementary schools; or providing home-based services.

31. This simply did not occur and TDOE has *not* provided these students with any community-based programs or otherwise created mainstreaming opportunities for any of these children to be around their non-disabled peers.

### C. K-5 AND MIDDLE-HIGH SCHOOL IS USED TO AVOID AIDES/STAFF IN REGULAR EDUCATION

32. Br. R. and L.L. were placed in the K-5th grade classroom at the CCSLC. They were among the class of students from K-5 and Middle-High School who needed supports in the form of an aide or staff person to assist their unique medical or learning needs and to appropriately access a meaningful and ambitious education.

33. For L.L., due to Hirschsprung's disease, he merely needed the support of an aide to assist him with bathrooming and academic instruction to be included with non-disabled peers. Yet on August 15, 2016, the beginning of his first-grade year, West Carroll Special School District moved L.L. to the completely segregated CCSLC based upon his bathrooming needs. He remained at CCSLC the entire year.

34. With assistance from an advocate, L.L. would escape CCSLC for 2017-2018, but he had to repeat first grade.

35. On August 11, 2017, two weeks into his first-grade year, West Carroll Special School District tried unsuccessfully to return L.L. to CCSLC for his bathrooming needs.[1]

---

[1] On August 11, 2017, Carroll County wrote a "Prior Written Notice" stating: "WCPS recommends that L.L. attend the Special Learning Center (change in placement) for L.L." For its explanation, West Carroll Special School District stated: "L.L. has been missing a lot of instructional time due to the amount of time (see documentation-1a) out of the classroom hourly for bathroom breaks." L.L. filed a due process complaint on August 24,

8

Case 3:18-cv-00754  Document 1  Filed 08/11/18  Page 8 of 19 PageID #: 8

36. For Br. R., due to autism spectrum disorder (ASD), he needed the support of a full-time classroom aide ("ancillary aide" or "paraprofessional") to be included with non-disabled peers. However, Br.R. was placed in the completely segregated CCSL for both kindergarten in the 2016-2017 school year and first grade in the 2017-2018 school year.

37. As a matter of practice, CCSLC became the sending-ground for students who, like L.L. and Br. R., needed help from support personnel such as an aide or therapist. This was done as administrative convenience—that is where such kids go.

38. The supports of additional personnel (an aide, a paraprofessional, or an "ancillary other") *should have been considered* in a less restrictive environment. However, IEP Teams were conditioned to use CCSLC for these children. Thus, the special school districts within Carroll County,[2] including West Carroll Special School District and Hollow Rock-Bruceton Special School District, did not truly consider and offer students a full range of educational services and supports in the least restrictive environment.

39. The CCSLC was an administratively easier (but illegal) alternative to the possibility of an aide for mainstreaming/inclusion, which was a perceived inconvenience to the regular education teachers or environment that could be avoided through CCSLC.

40. All decisions about a child's IEP and placement must be *individualized* and based upon the child's unique needs. Where a district employs policies or practices that set service delivery by rules or other administrative criteria, such policies and practices and

---

2017 to invoke "Stay Put" under IDEA and to prevent West Carroll Special School District from *again* segregating L.L.

[2] There are five special school districts within Carroll County: Hollow Rock-Bruceton Special School District, Huntington Special School District, McKenzie Special School District, South Carroll Special School District, and West Carroll Special School District.

9

criteria run afoul of both the IDEA and Section 504, resulting in a denial of FAPE and discrimination. *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004).

41. The decisions to place the Plaintiffs, Br.R., L.L., and Be.R, and similarly situated class of persons, at CCSLC were not *individualized based upon unique needs* with consideration of one's "least restrictive environment," but rather the result of policies or practices of administrative convenience or cost-effectiveness arising from the creation of CCSLC.

42. Once inappropriately placed at CCLSC, the quality of the educational instruction and materials themselves at CCSLC were severely lacking and did not meet minimum acceptable standards.

43. For L.L., the CCSLC did not even provide first grade textbooks as late as January of 2017. L.L. eventually obtained some textbooks sent over from West Carroll Special School District, but even those books were out of date (from the 1990s), unlike updated books provided to students in regular education classes. Without appropriate curriculum/textbooks, the CCSLC was printing out worksheets from websites, without regard for whether the lessons were tied to state educational standards or based upon peer-reviewed research as required by the IDEA.

44. With such poor quality as a systemic matter, students are unable to make progress that can actually be measured or that is appropriately ambitious in light of their unique circumstances. In fact, Br. R. and Be. R. received recycled IEPs from one year to the next—virtually *identical* to their previous school year.[3]

---

[3] Br.R's fourteen (14) IEP goals during the 2016-2017 school year were repeated almost completely verbatim in the fourteen (14) goals contained in his 2017-2018 IEP. And of Be.R.'s fifteen (15) IEP goals during the 2016-2017 school year, thirteen (13) of those IEP goals were repeated verbatim in his 2017-2018 IEP.

10

45. Shortly after L.L.'s due process action, around May of 2018, the state of Tennessee shut down the CCSLC forever. However, not only did it allow the CCSLC to exist for far too long, unmonitored and unsupervised, the State also did not undertake any efforts to ameliorate the past harms of the CCSLC to all of the students affected.

46. Further, L.L. put TDOE and TSBOE on notice of the claims in this lawsuit prior to filing this lawsuit, but TDOE and TSBOE responded in writing by declining to participate in alternative dispute resolutions.

## VI. THE CLASS ACTION CLAIMS

47. Plaintiffs, L.L., Br.R., and Be.R., make individual and class action claims under the IDEA; Section 504; and Title II of the Americans with Disabilities Act.

48. The class consists of the parents of all children, and their children, who live or are wards of Carroll County, Tennessee and who:

    a. Attended Preschool at CCSLC;

    b. Attended K-12 at CCSLC and required supports and services of an aide, paraprofessional, ancillary other, or similar staff-assistance for mainstreaming/inclusion.

49. The class is brought on behalf of the named Plaintiffs and those similarly situated under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure.

50. Numerosity is met because, upon information and belief, there are 40 to 70 students per school year, the majority of whom will likely meet the criteria, making joinder impractical. While the exact number is unknown, they could be identified through

computerized data available to Defendant and through discovery, as these children do have IEPs.

51. Common questions of law and fact exist between named Plaintiffs and members of the Class including the children placed in preschool with no opportunities for inclusion, and students placed in K-12 in lieu of provision of a staff person or aide.

52. Plaintiffs' claims are typical of those of the Class they seek to represent given that the CCSLC is common to all, there are no inclusion opportunities for preschool children, and the K-12 students are referred for administrative or financial convenience.

53. Plaintiffs have the same interests as the other Class members in prosecuting claims against the Defendants—an individualized assessment of service needs with opportunity for inclusion.

54. Class counsel is experienced in federal litigation, in actions concerning the rights of children covered by IDEA, Section 504, and Title II, as well as class action litigation generally.

55. The classes are brought upon behalf of the named Plaintiffs and those similarly situated under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure.

## VII. LEGAL CLAIMS

56. Defendants have violated IDEA; Section 504; and Title II of the Americans with Disabilities Act, each prohibiting illegal segregation practices.

57. **IDEA.** Under IDEA's most recent reauthorization, "almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by having high expectations for such children and ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible." 20 U.S.C. §1400(c)(5). Students' individual education plans must be

12

Case 3:18-cv-00754 Document 1 Filed 08/11/18 Page 12 of 19 PageID #: 12

"appropriately ambitious" to enable them to make progress in the general education curriculum in light of their unique abilities. *Endrew F. v. Douglas Ct. Sch. Dist. RE-1,* 137 S.Ct. 988, 1000 (2017). IDEA requires all students to be educated in their *least restrictive environment.* 20 U.S.C. §1412(a)(5). Therefore, "[t]o the maximum extent appropriate children with disabilities...are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C.§1412(a)(5).

58. These obligations extend to the preschool level. In September 2015, the United States Department of Education and the U.S. Department of Health and Human Services (HHS) issued a policy statement on promoting inclusion in early childhood programs to set a vision on this issue and provide recommendations to States, local educational agencies (LEAs), schools, and public and private early childhood programs.

59. On January 9, 2017, the U.S. Department of Education issued a "Dear Colleague" letter reinforcing that "[d]espite the expansion of early childhood programs, there has not yet been a proportionate expansion of inclusive early learning opportunities for young children with disabilities." Accordingly, the Office of Special Education Programs (OSEP) updated the February 29, 2012, Dear Colleague Letter (DCL) to "reaffirm a commitment to inclusive preschool education programs for children with disabilities and to reiterate that the least restrictive environment (LRE) requirements in section 612(a)(5) of the Individuals with Disabilities are fully applicable to the placement of preschool children with disabilities."

60. For local school districts who do not offer, or offer only a limited range of, public preschool programs, the LRE requirements must be met through different methods such as: (1) providing opportunities in preschool programs operated by other public agencies such as Head Start or community-based care; enrolling preschool children in private preschool programs; locating classes for them in regular public elementary schools; or providing home-based services.

61. **Title II of the ADA**. As Congress stated in its findings and purposes of the Americans with Disabilities Act: "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. §12101(a)(2). Thus, under Title II of the Americans with Disabilities Act, with amendments, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject5ed to discrimination by any such entity." 42 U.S.C. §12132.

62. Defendants have violated Title II by unnecessarily segregating persons because of their disabilities. *Olmstead v. L.C.,* 527 U.S. 581, 600 (1999). Defendants further violated the ADA by failing to reasonably modify the State's policies, practices, and procedures to avoid such discrimination and unnecessary segregation, 42 U.S.C. §12132, as well as by providing unequal educational opportunities to the Plaintiffs and class by failing to modify policies, practices, and procedures to avoid discrimination. 28 C.R.F. §35.130(b)(1)(i)-(iii), (vii).

63. The harm from unjustified isolation of persons with disabilities is manifold. As the Supreme Court said, "institutional placement of persons who can handle and benefit from

community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and "confinement in an institution severely diminishes the everyday life activities of individuals...." *Id.* at 600-01.

64. **Section 504**. Under the Rehabilitation Act, 29 U.S.C. §701, et. seq., Congress found that disability is a natural part of the human experience and in no way diminishes the right of individuals to enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society, 29 U.S.C. §701(a)(3)(F). The purpose of Section 504 of the Rehabilitation Act is to "empower individuals with disabilities to maximize ... inclusion and integration into society." 29 U.S.C. §701(b)(1). For schools, Section 504 also contains a least restrictive environment obligation. 34 C.F.R. §104.34(a).

65. TDOE and TSBOE have numerous supervision and monitoring responsibilities to ensure that the aforementioned least restrictive environment obligations are met by local school districts. Pre-school children at CCSLC, as well as the class of K-12 students at CCSLC, simply did not receive an appropriate education in their least restrictive environment due to the longstanding lack of diligence of TDOE and TSBOE and breach of duties.

66. TDOE and TSBOE are legally responsible for ensuring that a free appropriate education (FAPE) is provided to all students in the state of Tennessee. Where the local education agency (LEA) refuses, or is unable to provide FAPE, as the case is here, then the State is responsible for ensuring it.

67. Under IDEA, the State Educational Agency must "establish[] and maintain[] qualifications to ensure that personnel necessary to carry out this part are

appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities." 20 U.S.C. § 1412(a)(14)(A).

68. Carroll County Schools, including but not limited to, West Carroll Special School District and Hollow Rock-Bruceton Special School District, also require technical assistance from TDOE and TSBOE. The State Educational Agency must provide technical assistance to administrators in all public agencies. 34 C.F.R. § 300.119.

69. Carroll County Schools require training with respect to educating children with disabilities in their Least Restrictive Environment. With respect to the Least Restrictive Environment mandate, each State Educational Agency "must carry out activities to ensure that teachers and administrators in all public agencies (a) are fully informed about their responsibilities for implementing Sec. 300.114 [("General LRE Requirements")]; and (b) are provided with technical assistance and training necessary to assist them in this effort." 34 C.F.R. § 300.119.

70. Further, Carroll County Schools require training about an "appropriate" education for students with disabilities. The State Educational Agency is "responsible for general supervision" of education in the state. 20 U.S.C. § 1412(a)(11). Specifically, the State Educational Agency is responsible for ensuring that the requirements of Section 1412 of IDEA are met, including the right to a free appropriate public education in the least restrictive environment. 20 U.S.C. § 1412(a)(11)(A)(i).

71. In addition, the State Educational Agency is responsible for ensuring that "all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency — (I) are under the general supervision of individuals in the State who are responsible for educational

16

programs for children with disabilities; and (II) meet the educational standards of the State educational agency." 20 U.S.C. § 1412(a)(11)(A)(ii).

72. The State Educational Agency must "establish[] goals for the performance of children with disabilities in the State that—(i) promote the purposes of [Section 1412 of IDEA]," including the right to a free appropriate public education in the least restrictive environment. 20 U.S.C. § 1412(a)(15)(A).

73. The State is required to "monitor implementation of," and "enforce," IDEA, 20 U.S.C. § 1416(a)(1)(C), with the "[p]rovision of a free appropriate public education in the least restrictive environment" being deemed a "monitoring priorit[y]" that requires the collection of data using "quantifiable . . . and . . . qualitative indicators . . . to adequately measure performance," 20 U.S.C. § 1416(a)(3), with "measurable and rigorous targets for the indicators," 20 U.S.C. § 1416(b)(2)(A). The targets must be used by the State to "analyze the performance of each local educational agency in the State in implementing [IDEA]." 20 U.S.C. § 1416(b)(2)(C)(i).

74. Another "monitoring priorit[y]" for the State Educational Agency is its exercise of its "general supervisory authority" which includes "effective monitoring," 20 U.S.C. § 1416(a)(3)(B). The State Education Agency is to focus its monitoring on "improving educational results and functional outcomes for all children with disabilities." 20 U.S.C. § 1416(a)(2).

75. Similarly, under Title II of the ADA, Defendants have allowed the unnecessary segregation of persons because of their disabilities. *Olmstead v. L.C.,* 527 U.S. 581, 600 (1999).

76. And, under Section 504, despite receiving federal funds premises on non-segregation, Defendants have *not* ensured that the purpose of Section 504 is being met:

17

"empower[ing] individuals with disabilities to maximize … inclusion and integration into society." 29 U.S.C. §701(b)(1).

77. Defendants have breached the aforesaid obligations.

78. Defendants have woefully failed to *train* Carroll County Schools with respect to least restrictive environment and the integration mandates.

79. Defendants have woefully failed to *monitor* Carroll County Schools in the overuse and improper use of its inferior and unequal "Special Learning Center."

80. The class of Plaintiffs have been harmed educationally by Defendants' failure in that they have lost educational advancement and they require compensatory services and/or compensatory damages.

**WHEREFORE, premises considered**, Plaintiffs request process be served, that Defendants be compelled to timely answer, that Plaintiffs be awarded appropriate injunctive and equitable relief or compensatory damages relief to include:

A. Certify this case as a Class Action on behalf of the proposed classes;

B. Designate the named Plaintiffs as the representatives of the classes;

C. Designate Plaintiffs' counsel as counsel of record as Class Counsel;

D. Issue a Declaratory Judgment on behalf of Plaintiffs and Class members declaring the actions, policies, and practices as alleged herein violate the IDEA; Section 504; and Title II of the ADA;

E. Direct Defendants to provide or fund the staffing supports designed to allow students to be placed with non-disable peers, along with training and resources on determining least restrictive placements and the integration mandate;

F. Direct Defendants to provide compensatory services or compensatory damages;

G. Direct Defendants to provide or require use of inclusion specialists at the local school districts;

H. As appropriate, appoint an independent monitor to oversee Defendants' compliance with the Court's order;

I. Provide funding to the local school district, as needed, to comply with this order;

J. Award Plaintiffs their costs and attorneys fees; and

K. Grant any such other and further relief, at law or equity, which may be appropriate.

Respectfully Submitted,

**GILBERT RUSSELL McWHERTER SCOTT BOBBITT, PLC**

/s Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 504 Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com

&

**THE SALONUS FIRM, PLC**

s/ Jessica F. Salonus
Jessica F. Salonus (TN Bar No. 28158)
101 North Highland
Jackson, TN 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jsalonus@gilbertfirm.com

**ATTORNEYS FOR PLAINTIFFS**