L.L. a minor student, by and through
his parents, B.L. and R.L

and

Br.R. & Be.R., minor students, by and
through their parents, Chr. R. and Cha. R.,

and all persons similarly situated,

Plaintiffs,

v.

TENNESSEE DEPARTMENT OF
EDUCATION and TENNESSEE STATE
BOARD OF EDUCATION,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:18-cv-00754
Judge Aleta A. Trauger

## MEMORANDUM

Pending before the court is a Motion to Dismiss filed by the Tennessee Department of
Education ("TDOE") and Tennessee State Board of Education ("State Board"). (Docket No. 10.)
L.L., by and through his parents, and Br.R. and Be.R., by and through their parents, have filed a
Response (Docket No. 22), and the defendants have filed a Reply (Docket No. 27). For the reasons
stated herein, the defendants' motion will be granted in part and denied in part.

# I. BACKGROUND[1]

## A. The IDEA and Mainstreaming in Tennessee

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017) (citing 20 U.S.C. §§ 1401(3)(A)(i), 1412(a)(1)(A)). Tennessee has participated in the IDEA or its predecessor program for decades. *See, e.g., Clevenger v. Oak Ridge Sch. Bd.*, 573 F. Supp. 349, 349 (E.D. Tenn. 1983) (applying Act's predecessor in Tennessee), *rev'd on other grounds*, 744 F.2d 514 (6th Cir. 1984). Br.R., Be.R., and L.L. are all children entitled to services under the IDEA. Specifically, Br.R. and Be.R., who are brothers, have disabilities related to autism spectrum disorder. (Docket No. 1 ¶ 10.) L.L. has disabilities related to developmental delay and Hirschsprung's disease. He has substantial limitations related to speaking, learning, and motor skills, as well as difficulties related to digestion and having bowel movements. (*Id.* ¶ 7.)

"[T]he IDEA gives the 'primary responsibility . . . for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433–34 (6th Cir. 2006) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982)). At the heart of this collaborative process is the child's individualized education program, or "IEP." "The IDEA establishes procedures by which school officials, parents, and the student can collaborate to create an IEP" that takes into account the unique needs of the child, the special education expertise of the educators, and the voice of the child's parents

---

[1] Except where otherwise indicated, the facts set forth are taken from the plaintiffs' Complaint (Docket No. 1) and are accepted as true for the purposes of the Motion to Dismiss.

or guardians as advocates for the child's best interests and educational needs. *Id.* at 432 (citing 20 U.S.C. §§ 1401(11), 1414(d); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985)).

"The IDEA also provides for administrative procedures to resolve disputes when the people involved in the creation of an IEP are not able to agree on its substance." *Id.* (citing 20 U.S.C. § 1415(b)); *see* 20 U.S.C. § 1415(b)(6), (f)–(g), (k). "[A]ny party," including the child (typically by and through his parent), is entitled to present an administrative complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). The state is required to provide an impartial administrative due process hearing related to that complaint, which may be performed by either the local education agency ("LEA") or the state educational agency ("SEA").[2] If the hearing is performed by the LEA, however, the LEA's determination can be appealed to the SEA. 20 U.S.C. § 1415(f)(1), (g)(1). "Any party aggrieved by the findings and decision made under" the administrative complaint process "shall have the right to bring a civil action with respect to the complaint presented" in either state or federal court. 20 U.S.C. § 1415(i)(2)(A); *see also S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 642–43 (6th Cir. 2008).

One of the issues typically addressed in an IEP is how to provide the child special education and related services in the least restrictive environment, or "LRE," appropriate to his needs. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(cc), (V) (requiring discussion of LRE issues in IEP). The IDEA requires that, "[t]o the maximum extent appropriate, children with disabilities . . . [be] educated with children who are not disabled, and special classes, separate schooling, or other removal of

---

[2] TDOE is Tennessee's SEA, but the State Board also has some responsibilities for implementing policies related to the state's obligations under the IDEA. (Docket No. 1 ¶¶ 12–13.)

children with disabilities from the regular educational environment occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5). The practice of placing a disabled child in a general education setting alongside non-disabled peers, while supplementing that placement with special education and related services, is known in the special education field as "mainstreaming" or "inclusion." *See L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 794 (6th Cir. 2018). In some cases, a child will be capable of mainstreaming, but only if the school furnishes an aide or staff member to assist the child in the classroom. *See, e.g.*, *K.S. v. Strongsville City Sch. Dist.*, No. 1:13 CV 91, 2014 WL 2442193, at *5 (N.D. Ohio May 30, 2014).

For children in grades K through 12, mainstreaming can be accomplished by placing a disabled child in a general education classroom as part of the state's system of public schools. *See* Tenn. Code Ann. § 49-6-201(c) (requiring LEAs to establish kindergarten programs); Tenn. Code Ann. § 49-6-302(a), -402 (requiring LEAs to establish elementary schools); ); Tenn. Code Ann. § 49-6-301(b) (incorporating middle schools into statutory scheme); Tenn. Code Ann. § 49-6-403(a) (requiring LEAs to establish high schools). Under the IDEA, however, the State of Tennessee's obligation to provide a FAPE extends to "all children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a). Like many states, Tennessee does not provide universal public education for pre-kindergarten-aged children. Instead, Tennessee permits, but does not require, local education agencies ("LEAs") to operate preschools for "at-risk" four-year-olds. Tenn. Code Ann §§ 49-6-103, -104. Although "LEAs may apply to the [TDOE] for funding" for an authorized pre-kindergarten program, Tenn. Code Ann. § 49-6-105(a), the state's statutes emphasize that "[i]mplementation of these programs by LEAs shall be voluntary," Tenn. Code

Ann. § 49-6-103(c). Accordingly, a preschool-aged, IDEA-eligible child in Tennessee may find himself in a school district or zone where there is no public general education preschool in which he can participate in mainstreaming by being placed in a general education classroom alongside same-aged disabled peers. Other options, however, may be available, such as placement in a private preschool, the Head Start program, community-based care, or simply a public school classroom with slightly older non-disabled children. (Docket No. 1 ¶ 30.)

## B. The Carroll County Special Learning Center

Tennessee law calls on the state's counties to establish school districts—that is, LEAs—for the purpose of providing public education to the children within the counties' boundaries. Tenn.Code Ann. § 49–2–101. The state's laws, however, also permit the creation of smaller "special school districts" ("SSDs") operating within a county but independently of the county's school system (insofar as the county school system continues to exist, rather than having been replaced by a patchwork of SSDs). *See* Tenn. Code Ann. §§ 49-2-106, -127. West Carroll Special School District and Hollow Rock-Bruceton Special School District are SSDs located within Carroll County. For the 2016–17 and 2017–18 school years, the SSDs entered into contracts with the Carroll County Board of Education ("CCBE"), pursuant to which the CCBE would provide special education services to disabled students from within the SSDs' respective jurisdictions. The SSDs' contracts with the CCBE were reviewed and approved by TDOE. In order to provide services under the contract, the CCBE created a school known as the "Carroll County Special Learning Center" ("CCSLC"). CCSLC was operated out of a building attached the CCBE's own administrative building and included two preschool classrooms, one kindergarten through fifth-grade classroom, and one sixth- through twelfth-grade classroom. The plaintiffs believe that CCSLC served between forty and seventy students. (Docket No. 1 ¶¶ 23–27.)

The plaintiffs allege that the SSDs used CCSLC as a "sending-ground" for disabled students who required an aide or staff assistance during the day, in order to keep those students out of general education classrooms as an "administrative convenience." (*Id.* ¶ 37.) Specifically, the plaintiffs allege that the SSDs "conditioned" IEP teams to recommend that any student who would require an in-class aide be sent to CCSLC, even if the child's appropriate LRE would have been in a general education school. (*Id.* ¶ 38.) L.L. and Br.R. were among the students allegedly placed in CCSLC to avoid having a special education aide in a general education classroom. L.L. requires an aide to assist him with bathroom breaks. (*Id.* ¶ 33.) Br.R. needs a full-time classroom aide, known as an "ancillary aide" or "paraprofessional." (*Id.* ¶ 36.) Br.R. and L.L. were placed in CCSLC's K-5 classroom for the 2016–17 school year, and Br. R. continued in the classroom for the 2017–18 year, while L.L. was permitted to attend another school in the West Carroll SSD. (*Id.* ¶¶ 32, 34, 36.) Personnel at L.L.'s new school sought to return him to CCSLC, but he prevented them from doing so by filing an IDEA due process complaint and invoking the Act's "stay put" protections. *See* 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518; *N.W. ex rel. J.W. v. Boone Cty. Bd. of Educ.*, 763 F.3d 611, 617 (6th Cir. 2014).

Because the SSDs did not operate preschools, there were no general education preschool classrooms to keep special education aides out of. By the same token, however, the lack of general education preschool classrooms left the SSDs with no public school option for preschool-aged children other than CCSLC. The plaintiffs argue that the SSDs placed preschool students, by default, in the wholly segregated environment of CCSLC. For the 2016–17 school year, Be.R. was placed in CCSLC's preschool class for three-year-olds, known as "P3." For the 2017–18 school year, he was placed in its preschool class for four-year-olds, known as "P4." While Be.R. was in

CCSLC's preschool classes, CCSLC offered no opportunities for mainstreaming to the preschool students. Accordingly, he was educated solely around disabled peers. (*Id.* ¶¶ 28–31.)

**C. Procedural History**

L.L. filed a due process complaint against the West Carroll SSD involving his placement in CCSLC. He did not name the TDOE or the State Board in that complaint. L.L. and the West Carroll SSD reached a resolution of any claims he might have had against the SSD. That resolution expressly left open the possibility of L.L. pursuing claims against the TDOE and State Board. Br.R. and Be.R. did not file administrative complaints against the Hollow Rock-Bruceton SSD. (*Id.* ¶¶ 19–20.) Shortly after L.L.'s due process action, in May of 2018, the State of Tennessee "shut down" CCSLC permanently, a step that the plaintiffs attribute to the scrutiny brought on by L.L.'s complaint. (*Id.* ¶ 45.)

On August 11, 2018, LL., Br.R. and Be.R., through their respective parents, filed their putative Class Action Complaint in this court, naming the TDOE and the State Board as Defendants and alleging that those agencies' failures to appropriately monitor the SSDs and enforce the IDEA's LRE requirements contributed to the denial of students' individually determined LREs at CCSLC. (Docket No. 1.) They seek to represent a class consisting of "the parents of all children, and their children, who live [in] or are wards of Carroll County, Tennessee and who . . . [a]ttended Preschool at CCSLC [and/or] [a]ttended K-12 at CCSLC and required supports and services of an aide, paraprofessional, ancillary other, or similar staff-assistance for mainstreaming/inclusion." (*Id.* ¶ 48.) They plead claims under the IDEA, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12101 et seq. (*Id.* ¶¶ 57, 61, 64.) On October 22, 2018, the defendants filed a Motion to Dismiss. (Docket No. 10.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. Causes of Action Against State Educational Agencies under the IDEA

The defendants argue that the court should dismiss the claims against them because the IDEA does not create a cause of action against SEAs for their failures of monitoring and oversight.

The defendants do not argue—nor could they plausibly argue—that the state agencies lack obligations under the Act. Under the express terms of the IDEA, "[t]he State educational agency is responsible for ensuring that . . . the requirements of [the IDEA's state grant program] are met," and "all educational programs for children with disabilities in the State, including all such programs administered by any . . . local agency . . . are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities." 20 U.S.C. § 1412(a)(11)(A); *see also Ullmo ex rel. Ullmo v. Gilmour Acad.*, 273 F.3d 671, 679 (6th Cir. 2001) ("Under the IDEA, the responsibility for ensuring that disabled students receive a free appropriate public education lies with the state educational agency (SEA)."). The state is not merely a pass-through entity that can disburse funds to LEAs "and then wait[] for the phone to ring." *Cordero by Bates v. Penn. Dep't of Educ.*, 795 F. Supp. 1352, 1362 (M.D. Pa. 1992). To the contrary, an SEA has express implementation, monitoring and oversight obligations. 20 U.S.C. § 1416. The defendants argue, nevertheless, that when they fail in their responsibilities and those failures lead to a child's being denied a FAPE or LRE, the child is limited to suing his LEA.

Numerous courts have rejected that argument, including, repeatedly, this one. *See, e.g., Pachl v. Seagren*, 453 F.3d 1064, 1070 (8th Cir. 2006) ("[O]ur court has suggested that 'systemic violation' of the State's responsibilities under the IDEA might give rise to state liability."); *St. Tammany Par. Sch. Bd. v. State of La.*, 142 F.3d 776, 784 (5th Cir. 1998) ("[B]oth the language and the structure of IDEA suggest that either or both [the SEA and LEA] may be held liable for the failure to provide a free appropriate public education, as the district court deems appropriate after considering all relevant factors." (citation omitted)); *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 953 (4th Cir. 1997) ("[T]he SEA is ultimately responsible for the provision of a free appropriate public education to all of its students and may be held liable for the state's failure to

assure compliance with IDEA."); *S.P. v. Knox Cty. Bd. of Educ.*, 329 F. Supp. 3d 584, 594 (E.D. Tenn. 2018) ("TDOE, as the state educational authority, is responsible for ensuring that the requirements of the IDEA are carried out. . . . Because there are material issues of fact whether TDOE carried out its duties under the IDEA, its motion for summary judgment is denied."); *J.M. v. Dickson Cty. Sch. Dist.*, No. 3:17-cv-00405, Docket No. 31 at 10 (M.D. Tenn. Dec. 14, 2017) ("Th[e]se systemic, state-level failures are relevant not only to [the child's] past deprivations but whether he can expect, with any confidence, to receive a FAPE going forward. The defendants are therefore appropriate parties to the case . . . ."); *Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*, 258 F. Supp. 3d 1114, 1125 (E.D. Cal. 2017) (noting that the IDEA's "choice of words suggests Congress . . . anticipated private suits in response to statewide, systemic failures in the education of students with disabilities"); *Kalliope R. ex rel. Irene D. v. N.Y. State Dep't of Educ.*, 827 F. Supp. 2d 130, 141 n.3 (E.D.N.Y. 2010) (noting that the state educational agency "is a proper defendant in this action, which challenges a [state] policy that allegedly interferes with the IEP development process for disabled students in a systemic manner"); *Fetto v. Sergi*, 181 F. Supp. 2d 53, 72 (D. Conn. 2001) ("The state education agency is a proper party to actions involving claims of systemic violations of the IDEA . . . ."); *Corey H. v. Bd. of Educ. of City of Chicago*, 995 F. Supp. 900, 913 (N.D. Ill. 1998) ("[C]ourts have found that the state educational agency is responsible for a local school district's systematic failure to comply with an IDEA mandate."). The court remains unpersuaded.

The defendants insist that the question here is whether the IDEA includes an implied cause of action against them. (Docket No. 14 at 9.) But the cause of action against an educational agency under the IDEA for denial of a FAPE or an LRE is not implied; it is express. Pursuant to 20 U.S.C. § 1415(i)(2)(A), "[a]ny party aggrieved by the findings and decision made under" the IDEA's

complaint procedures[3] "shall have the right to bring a civil action with respect to the complaint presented . . . , which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." *Id.* Nothing in 20 U.S.C. § 1415(i)(2)(A) limits the cause of action created to complaints against LEAs, and it would be strange if it did, given the IDEA's clear contemplation that both LEAs *and* SEAs will have duties under the Act, with the SEA bearing the ultimate responsibility for compliance. The defendants have read an exception into 20 U.S.C. § 1415(i)(2)(A) that does not exist, then argued that the court must find an implied cause of action to get around that exception. There is no need to do so. The court will simply read the statute as written, with no limitation on which culpable educational agency an aggrieved child can sue.

The plaintiffs have alleged that the TDOE and the State Board were aware of CCSLC but failed to take basic supervisory steps to prevent its being used as a tool for warehousing certain types of disabled students despite their LRE needs, directly resulting in the deprivations that form the basis of the plaintiffs' claims. They also allege that, once the defendants became aware of the problems at CCSLC and shut the school down, they took no steps to ensure that any damage done to the students who had been improperly placed there was ameliorated. At least at the complaint stage, those allegations are sufficient to support causes of actions against an SEA. The court, therefore, will not dismiss the claims on that ground.

## B. Exhaustion

The defendants argue next that the plaintiffs' causes of action are barred because they either failed to exhaust the administrative complaint-and-appeal process or failed to exhaust it with

---

[3] As the court discusses, *infra*, the Sixth Circuit has construed this provision as extending to cases where the plaintiff did not go through the technicality of seeking and receiving an administrative determination when doing so would have been futile or inadequate.

regard to these defendants. Specifically, Be.R. and Br.R. failed to avail themselves of the administrative process altogether, and, while L.L. did file and resolve an administrative complaint, he did not name the TDOE or State Board in that complaint. The plaintiffs concede that Be.R. and Br.R. did not exhaust the administrative process and that L.L. did not name the state agencies in his administrative complaint. They argue, however, that exhaustion should not be required in this case because the issues they have identified are systemic problems for which exhaustion would have been futile.

It is well-settled that a plaintiff generally must exhaust the administrative process before bringing a cause of action under the IDEA. 20 U.S.C. § 1415(i)(2); *see also S.E.*, 544 F.3d at 642. Claims brought under Title II and Section 504 will also be dismissed for failure to exhaust IDEA procedures if the "gravamen" of the claims is the denial of FAPE. *Fry*, 137 S. Ct. at 755. The Sixth Circuit has held that the rationale behind the exhaustion requirement is that "[t]he federal courts are not the entities best equipped to craft an IEP or remedial substitutes. They are, instead, suited to reviewing detailed administrative records, such as those that would be furnished through due process hearings . . . under the IDEA." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433–34 (6th Cir. 2006); *see also Fry v. Napoleon Cmty. Schs.*, 788 F.3d 622, 626 (6th Cir. 2015) (observing that the IDEA "calls for highly fact-intensive analysis of a child's disability and her school's ability to accommodate her" and that the administrative exhaustion procedures "ensure that the child's parents and educators, as well as local experts, are first in line to conduct this analysis"), *rev'd on other grounds*, 137 S. Ct. 743 (2017).

The courts, however, have recognized that the IDEA does not require administrative exhaustion "when it would be futile or inadequate to protect the plaintiff's rights." *Donoho ex rel. Kemp v. Smith Cty. Bd. of Educ.*, 21 F. App'x 293, 297 (6th Cir. 2001) (quoting *Covington v. Knox*

*Cty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000); citing *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 936 (6th Cir. 1989)); *see also Honig v. Doe*, 484 U.S. 305, 327 (1988) (holding that a claim under the predecessor statute to the IDEA could proceed in federal court without prior administrative exhaustion where such exhaustion would have been futile); *F.C. v. Tenn. Dep't of Educ.*, 745 F. App'x 605, 608 (6th Cir. 2018) ("But [the exhaustion requirement] is not absolute. There are narrow exceptions to the exhaustion requirement: when the use of administrative procedures would be futile or inadequate to protect the plaintiff's rights and when the plaintiff was not given full notice of his procedural rights under the IDEA." (citations omitted)).

One of the situations in which exhaustion is often found to have been futile or inadequate is when a plaintiff was denied a FAPE due to a systemic problem that would need to be resolved by policymakers, not merely through the administrative complaint process. *See D.R. v. Mich. Dep't of Educ.*, No. 16-13694, 2017 WL 4348818, at *3 (E.D. Mich. Sept. 29, 2017) ("Courts have applied the futile or inadequate exceptions to exhaustion when plaintiffs seek relief that is not otherwise available through the administrative process, *i.e.* allegations of structural or systemic failure." (citation and internal quotation marks omitted)); *Jackie S. v. Connelly*, 442 F. Supp. 2d 503, 518 (S.D. Ohio 2006) (collecting cases). Some courts have gone a step further and recognized systemic violations as presenting their own distinct exception to the exhaustion requirement, in addition to the general exception for cases where administrative procedures would have been futile or inadequate. *See, e.g.*, *Urban by Urban v. Jefferson Cty. Sch. Dist. R-1*, 89 F.3d 720, 725 (10th Cir. 1996) (referring to the two as separate exceptions). In recent unpublished cases, however, the Sixth Circuit has stressed that it has not recognized a separate exception to the exhaustion requirement hinging only on the systemic nature of the plaintiff's allegations. *See F.C.*, 745 F. App'x at 609 ("[W]e doubt that a plaintiff is exempt from the IDEA's exhaustion requirement just

because he paints the allegations in his complaint as broadly applying to all students."); *W.R. v. Ohio Health Dep't*, 651 F. App'x 514, 521 (6th Cir. 2016) ("[The plaintiff's] claims of systemic violations . . . are subject to the IDEA's exhaustion requirement."). Whether or not systemic violations present a separate exception to the exhaustion requirement, however, the futility exception would apply in any case where the systemic nature of the allegations, alone or in the context of additional facts, rendered seeking administrative relief futile or inadequate to protect the plaintiff's rights. *See D.R.*, 2017 WL 4348818, at *3.

One challenge to discussing allegedly systemic problems, however, is that it is not always clear where the line should be drawn between a *systemic* problem that justifies departing from the usual procedural requirements and a merely *common* problem that does not. The most workable solution, in the view of the court, is to approach the issue practically, with a focus on the purposes of the exhaustion requirement and the question of actual futility or inadequacy of the administrative process. The court should ask whether the plaintiffs, artful pleading aside, have presented a broad, policy-level problem, for which it would be a waste of time to go through the administrative process, or whether they have presented what is, at its core, a context-dependent, student-specific problem that is better addressed by—and stands a meaningful chance of resolution by—the experts on the ground, even if there may be other students suffering from similar alleged deprivations. Be.R.'s allegations involving the categorical refusal to offer mainstreaming to preschoolers target a broad policy with fundamentally structural roots, arising out of policymakers' decisions rather than the mishandling of individual cases. Those allegations are, therefore, of the type that this court and others have historically considered beyond the efficacy of the administrative process. The court, therefore, will not dismiss Be.R.'s claim for failure to exhaust.

Br.R.'s and L.L.'s allegations regarding K–12 students, however, present a more difficult case. The plaintiffs offer a general description of the policy or practice they challenge—the warehousing, at CCSLC, of students who needed in-class aides or other support personnel—but they are markedly vague about how that process worked. They claim that "IEP Teams were conditioned to use CCSLC." (Docket No. 1 ¶ 38.) They posit that CCSLC "became a sending ground," "as a practice," for children who needed classroom aides, because the attitude within the SSDs was that CCSLC was "where such kids go." (*Id.* ¶ 37.) They argue that the SSDs "did not truly consider and offer students a full range of educational services and supports in the least restrictive environment." (*Id.* ¶ 38.) What the plaintiffs do not actually allege, however, is that all such students were placed in CCSLC as a categorical matter.[4] Indeed, the plaintiffs' own cases refute any such contention, given that L.L. was placed outside of CCSLC for the 2017–18 school year. What the plaintiffs do allege, therefore, seems to be more in the nature of a thumb on the scales—the type of allegation that, absent some especially incriminatory testimony or internal documents, would be almost impossible to consider without a developed factual record for each child and which could not be easily remedied with categorical relief. Moreover, resorting to the administrative complaint process plainly was not futile here, given that L.L., unlike Br.R., did avail himself of the administrative process, and it worked—or at least worked well enough that L.L. was willing to release his claims against the SSD. Indeed, CCSLC was ultimately shuttered altogether in the wake of L.L.'s drawing attention to its deficiencies—an outcome that the plaintiffs strongly suggest was in direct response to the administrative complaint. (Docket No. 22 at 3.)

---

[4] In their briefing, the plaintiffs go a step further and argue that "students with disabilities needing an aide were automatically sent to the CCSLC." (Docket No. 22 at 16.) That allegation does not appear in the Complaint.

The distinction between systemic and non-systemic allegations is a meaningful one, but the term, if deployed too freely, can confuse more than it illuminates. Public schools are a system. The IDEA is a system. Every problem that arises under either is likely to have, in some sense, systemic roots. The exception to the exhaustion requirement that the courts have recognized is not intended to excuse every plaintiff whose alleged violation is a symptom of a deeper problem. Rather, what the courts have recognized is a narrow exception for those cases where the administrative process would have served only to delay the underlying problem's being addressed. The facts on the ground demonstrate that that was not the case here; to the contrary, the administrative process was responsive to the plaintiffs' concerns when raised. Indeed, this case serves as a reminder that there can be real costs to skipping the administrative process in favor of litigation in the courts—including real costs to students themselves. The plaintiffs, in their Complaint, paint a disturbing picture of the conditions at CCSLC. It is worth noting that, by their own account, those conditions might be continuing today if L.L. had not filed an administrative complaint and had, instead, merely waited for the courts to solve the problem. Dozens of students could have been stranded in CCSLC while the slow pace of litigation moved forward.

The court, therefore, concludes that Br.R. and L.L. were required to exhaust their administrative options, barring Br.R. from filing a claim in this court.[5] L.L.'s case, however, is more complicated, because he did pursue administrative review with regard to his LEA—the only entity against which, in these defendants' view, he had any right to pursue a complaint in the first place. Nevertheless, in one of the aforementioned unpublished cases regarding exhaustion, the

---

[5] The fact that exhaustion was necessary for Br.R. and L.L. is, moreover, not negated by the fact that they filed this case as a putative class action. Although it may be the case that, in an IDEA class action, it would be futile to require exhaustion for all unnamed class members, that does not change the need for Br.R. and L.L., as named plaintiffs, to exhaust the administrative process individually. *See Mrs. M v. Bridgeport Bd. of Educ.*, 96 F. Supp. 2d 124, 135 (D. Conn. 2000) ("Simply . . . styling a case as a putative class action should not excuse compliance with the required exhaustion of administrative procedures under the IDEA.").

Sixth Circuit suggested that, when a plaintiff pursues an administrative complaint against an LEA but does not name any state agencies, then that omission should be treated as a failure to exhaust with regard to those agencies. *See F.C.*, 745 F. App'x at 608 ("[The plaintiff] did not raise his claims challenging the department[]—the only party remaining in this action— . . . in either complaint before the ALJ. Accordingly, he never exhausted, or attempted to exhaust, his claims against the Tennessee Department of Education."). The court is skeptical that naming the TDOE or State Board in L.L.'s administrative complaint would have accomplished much, given that those defendants continue to argue that the IDEA imposes no obligations on them that are enforceable by students or parents. Nevertheless, the court acknowledges that the most consistent application of the exhaustion requirement is for an exception either to apply or not apply in each case, without the plaintiffs having to guess at which parties must be included at the administrative complaint stage. Enforcing such a rule would, among other things, ensure that all potentially culpable governments play a full role in resolving any dispute from the beginning. Accordingly, L.L. has, like Br.R., failed to exhaust the administrative complaint process, as it relates to this case.

With regard to L.L.'s and Br.R.'s Title II and Section 504 claims, the plaintiffs make no argument that those claims should be exempt from the exhaustion requirement because the gravamen of the claims is something other than the violation of the IDEA's core guarantee of a FAPE.[6] *See Fry*, 137 S. Ct. at 755. The court, therefore, will dismiss all claims on behalf of those

---

[6] The court notes that the defendants have misstated the test for this issue—relying, in fact, on the very Sixth Circuit case law that was overruled when the Supreme Court adopted the gravamen test in *Fry*. (*See* Docket No. 11 at 6 (stating, based on citations to pre-*Fry* cases, that the exhaustion requirement "covers not only claims brought under the IDEA, but also any claims that *could* have been brought under the IDEA" and that, "[w]hen a plaintiff alleges injuries that could be redressed to any degree by the IDEA's procedures and remedies, exhaustion of those remedies is required" (citations and internal quotation marks omitted)).) *See Fry*, 137 S.Ct. at 753 (discussing "how the Sixth Circuit went wrong in addressing" the issue of exhaustion for non-IDEA claims), 756 (noting that the "same conduct might violate all three" of the IDEA, Title II, and Section 504, but the non-IDEA claims would only require exhaustion if the gravamen was the denial of a FAPE); *see also Sophie G. ex rel. Kelly G. v. Wilson Cty. Sch.*, 742 F. App'x 73, 77 (6th Cir.

plaintiffs without prejudice. The court will consider the remaining arguments only with regard to Be.R.'s preschool-based claims.

## C. Mootness

The defendants argue next that the plaintiffs' claims are moot, because CCSLC has been shut down. The plaintiffs respond that their claims are not moot because they do not merely seek the closing of CCSLC, but rather additional prophylactic and ameliorative relief intended to ensure that the students receive their LREs going forward and are able to overcome the educational deficits caused by the SSDs' past violations.

The federal courts have an ongoing obligation under Article III to limit their jurisdiction to cases that may actually affect the rights of the litigants. *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (citing *Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 276 (6th Cir. 2001)). When, therefore, the issue presented by a case is "no longer live" or when "the parties lack a legally cognizable interest in the outcome," the case becomes moot and falls outside the boundaries of Article III. *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue." *Cleveland Branch, Nat'l Ass'n for the Advancement of Colored People v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (citing *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). Accordingly, "[i]f events occur during [an IDEA] case . . . that make it 'impossible for the court to grant any effectual relief whatever to a prevailing party,' the [case] must be dismissed as moot." *I.L. ex rel. Taylor v. Tenn. Dep't of Educ.*, 739 F. App'x 319, 323

---

2018) (noting *Fry*'s rejection of the Sixth Circuit's test); *P.G. ex rel. R.G. v. Rutherford Cty. Bd. of Educ.*, 313 F. Supp. 3d 891, 898 (M.D. Tenn. 2018) (Crenshaw, C.J.) (same); *Mitchell ex rel. Mitchell v. Cmty. Mental Health of Cent. Mich.*, 243 F. Supp. 3d 822, 833 (E.D. Mich. 2017) (same).

(6th Cir. 2018) (quoting *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011)).

"The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties . . . ." *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (quoting *Crane v. Ind. High Sch. Athletic Ass'n*, 975 F.2d 1315, 1318 (7th Cir. 1992)). Because "general money damages are not available under the IDEA," *Covington*, 205 F.3d at 916 (citing *Crocker v. Tennessee Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 386–87 (6th Cir. 1992)), Be.R. cannot rely on such damages to argue that his claims remain remediable. General money damages, however, are not the only avenue pursuant to which an IDEA defendant might bear an obligation to expend its resources to rectify its past violations of the Act. "An award of compensatory education is an equitable remedy that a court can grant as it finds appropriate." *Bd. of Educ. of Fayette Cty., Ky. v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007) (citing 20 U.S.C. § 1415(i)(2)(C)(iii); *Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006)). For example, if a student is denied a FAPE in a way that has hindered his progress in certain subject areas, a court may order specific compensatory educational services in an attempt to catch him up. *See, e.g.*, *Somberg ex rel. Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 177 (6th Cir. 2018) (affirming award of 1,200 hours of compensatory education in light of low scores in subject-area tests by student denied a FAPE); *Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 978 (6th Cir. 2012) (affirming award of 768 hours of compensatory instruction in reading, writing, and mathematics).

The plaintiffs, including Be.R., have requested compensatory education in this case. (Docket No. 1 at 18.) They also identify various forms of injunctive relief that, they argue, are necessary to ensure that the SSDs offer necessary mainstreaming opportunities in the future, rather

than sliding back into their old ways in the absence of oversight. (*Id.* at 18–19.) At this stage in the proceedings, the court cannot conclude that such remedies would be unnecessary. Be.R. did not sue based on his right to be educated away from a particular building. He sued based on his right to be educated in the LRE appropriate to his needs. One school's closing does not establish that the issues he has identified have been resolved or that he has received everything necessary to receive a FAPE in light of any damage that might have been done by the SSDs' alleged violations and the defendants' alleged failures that caused those violations to occur and persist. The court, accordingly, will not dismiss Be.R.'s claims as moot.

## D. Failure to Allege that Mainstreaming was Appropriate for Be.R.

Finally, the defendants argue that Be.R.'s claims should be dismissed because the plaintiffs have not specifically alleged that his IEP actually entitled him to mainstreaming. The defendants point out that the LRE requirement does not guarantee mainstreaming for all children and a denial of an appropriate LRE would only occur in the case of any child for whom CCSLC was not, in fact, the LRE appropriate to his needs. The plaintiffs respond that the Complaint alleges violations of the IDEA by the failure to provide Be.R. an individualized determination with regard to whether mainstreaming, or some other option on the spectrum of isolation versus seclusion, other than the total segregation offered by CCSLC, would be appropriate.

A statutory claim under the IDEA must be brought by a "party aggrieved," 20 U.S.C. § 1415(i)(2)(A), and that grievance must arise out of a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," 20 U.S.C. § 1415(b)(6)(A). *See Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 628 (6th Cir. 2010). The Supreme Court has held that a court's inquiry, in considering a case brought under those provisions, "is

twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206–07 (1982) (footnote omitted). In other words, "[a] complaint concerning an IEP may allege both procedural and substantive violations of the IDEA." *Somberg.*, 908 F.3d at 171 (citing 20 U.S.C. § 1415(f)(3)(E)). The procedural challenges permitted include those "concern[ing] 'the preparation of an IEP.'" *Id.* (quoting *Hendrick Hudson*, 458 U.S. at 206). Although not every procedural violation entitles a child to relief under the IDEA, a procedural violation will be treated as equivalent to a denial of a FAPE if it "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

The defendants' argument, in essence, is that the plaintiffs, including Be.R., have failed to raise an issue under the second part of the twofold inquiry—involving substantive challenges—because they have not ruled out the possibility that a thorough review of the plaintiffs' needs might reveal that CCSLC was, in fact, each respective plaintiff's appropriate LRE. The defendants do not allege, at least at this stage, that the SSDs ever actually performed such a thorough review or made such a determination; rather, their argument is that Be.R. does not have a claim under the IDEA because it might turn out that the environment to which he was sorted by default had been his appropriate LRE all along. Even if that is possible, however, that possibility has no bearing on Be.R.'s procedural claims under the first part of the two-fold inquiry, involving procedural errors. What the Complaint alleges is not merely a failure to mainstream, but a failure even to consider an opportunity for mainstreaming or inclusion. (Docket No. 28 ¶¶ 28–31.) The LRE requirement

states that, "[t]o the maximum extent appropriate, children with disabilities . . . [shall be] educated with children who are not disabled." 20 U.S.C. § 1412(a)(5). Simply assuming, as a categorical matter, that every child of a certain age shall be wholly segregated from non-disabled children is a failure to make an individualized LRE determination and, therefore, a challengeable procedural violation under the IDEA. *See Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004) (recognizing IDEA claim based on "predetermination" of a particular course of action); *Barney v. Akron Bd. of Educ.*, No. 5:16CV0112, 2017 WL 4226875, at *10 (N.D. Ohio Sept. 22, 2017) ("Predetermination is a violation of the IDEA."). Regardless of what Be.R.'s appropriate level of exposure to non-disabled children and a general education setting may be, he was entitled to at least consideration of the possibility that he was entitled to more than CCSLC offered. That lack of individualized consideration, among other things, would have significantly impeded his parents' right to participate in formulating the IEP and may have impeded his own right to a FAPE. Be.R. has, therefore, stated a claim under the IDEA.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss filed by TDOE and the State Board (Docket No. 10) will be granted in part and denied in part, and Br.R. and L.L.'s claims will be dismissed without prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge